* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives; therefore, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pretrial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. On or about April 29, 2003, an employer-employee relationship existed between plaintiff and defendant-employer.
2. On or about April 29, 2003, while plaintiff was employed by defendant-employer, plaintiff sustained a compensable occupational disease, specifically bilateral carpal tunnel syndrome, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and the defendant-employer was self-insured and its claims were administered by Crawford Company.
3. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and the subject matter.
4. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
5. Plaintiff's average weekly wage is $477.33 and compensation rate is $318.24, as stipulated to by the parties.
6. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit #1 — North Carolina Industrial Commission Forms; Employee's answers to interrogatories; Hart Industrial Clinic; Dr. Mark McGinnis, Hickory Orthopaedic Center; Piedmont Therapy; 6/16/04 Order regarding second opinion medical treatment related correspondence; 4/5/04 Order related correspondence regarding employee's motion to change treating physician to Dr. DeFranzo; Dr. Anthony DeFranzo, Comp Rehab; 10/4/04 Employee letter regarding treatment by Dr. DeFranzo; Ms. Barbara Penny/Medical Case Manager Crawford Healthcare Management Services; Job search (partial records); *Page 3 
2/22/05 Functional Capacity Evaluation (FCE); 3/31/05 Order for Employment Security Records; and Termination documents (notebook of stipulated documents — 129 pages).
 b. Stipulated Exhibit #2 — job analysis report
 Stipulated Exhibit #3 — videotape of the proffered jobs titled "Job Analysis" demonstrating positions available for the plaintiff to perform in the defendants plant at the time of his separation from employment
7. Other exhibits admitted into evidence: Plaintiff's Exhibit #1 — job search log completed by plaintiff (admitted for illustrating that plaintiff had conducted job searches since those referenced in the job search records contained in Stipulated Exhibit #1)
 * * * * * * * * * * *
Based on the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 35-year-old right hand dominant man who had worked for the defendant-employer, a furniture manufacturer located in Connelly Springs, North Carolina. Plaintiff did not graduate from high school and did not have a GED. Plaintiff began his employment with defendant-employer as an assembly line worker on or about September 1, 2001.
2. As an assembly line worker, plaintiff was responsible for operating air screwdrivers, drills, ziz wheel wood sanders, and hammers; fastening square clamps; picking up tops and cases; and turning and flipping cases. In performing these tasks and operating these machines, plaintiff was required to use an air screwdriver which torques and vibrates as about *Page 4 
sixteen (16) one and one-half inch to three inch (1 ½" to 3") screws are inserted into furniture per minute.
3. On or about April 28, 2003, plaintiff presented to Dr. Jay Piland at Hart Industrial Clinic with complaints of pain in both wrists for approximately one year, with progressively increasing pain to the palmar aspect of his right wrist and forearm. Dr. Piland diagnosed bilateral tendonitis with early carpal tunnel syndrome components and referred plaintiff for bilateral nerve conduction studies.
4. On July 18, 2003, Dr. Mark McGinnis, a board certified orthopaedic surgeon, examined plaintiff. During the visit, plaintiff reported that he had been wearing a right wrist splint for the past three months during the day and night; complained of significant nighttime pain; and tested positive for moderate right carpal tunnel syndrome. Dr. McGinnis diagnosed right carpal tunnel syndrome and mild thenar muscle weakness. Dr. McGinnis scheduled plaintiff for a four week follow up visit and decided to have him continue wearing the wrist splint and take Naprosyn since he was not having any significant nighttime symptoms.
5. On August 12, 2003, plaintiff presented to Dr. McGinnis and reported that his right hand pain had gotten worse, with increased pain, "paraesthesias, hypethesias", and pain awakening him at night. He also reported mild symptoms in the left hand. Upon examination, plaintiff had a slight amount of swelling in the flexor tendons proximal to the right carpal tunnel; bilateral positive Tinel's; and bilateral positive Phalen's. An injection of Triamcinolone and Xylocaine was administered to the right carpal tunnel.
6. On September 26, 2003, Dr. McGinnis performed a right carpal tunnel release at Frye Regional Medical Center and prescribed Percocet for pain. Dr. McGinnis restricted plaintiff from all work until September 29, 2003, at which time plaintiff was allowed to resume *Page 5 
light duty work with the restrictions of no use of the right hand and no driving or operating potentially dangerous machinery while taking Percocet.
7. On October 6, 2003, Dr. McGinnis removed plaintiff's stitches and examined plaintiff's right hand. Dr. McGinnis observed there was no swelling or ecchymosis or evidence of infection and plaintiff had good range of motion of his fingers. Dr. McGinnis prescribed Percocet and ordered plaintiff to continue wearing the splint that he already had for protection for another two weeks when he was scheduled for a follow-up examination. Plaintiff was restricted from the use of his right hand at work and listed as partially disabled.
8. On October 20, 2003, Dr. McGinnis examined plaintiff and observed a well-healed incision with mild tenderness to palpation of the incision. Plaintiff had a slight amount of pain with full passive extension of the fingers and he held his right hand in the air; cradled the hand at times; and moved his fingers very slowly and methodically. Dr. McGinnis opined that plaintiff seemed reluctant to use his right hand, so a hand therapist was referred to work with plaintiff twice a week for the following three weeks to try to increase the function of plaintiff's hand and try to decrease some of the subjective symptomatology. Dr. McGinnis prescribed Vicodin for pain as needed and continued plaintiff's light duty work restrictions to work with limited use of the right hand and with no lifting over five (5) pounds with the right hand. Plaintiff was scheduled for a three-week follow up exam that was to include grip strengths, pinch strengths, and moving two-point discrimination of both hands.
9. From October 23, 2003 through October 30, 2003, The Hand Therapy Center provided the therapy and modalities for plaintiff as requested by Dr. McGinnis.
10. On October 23, 2003, defendant-employer laid off the claimant pursuant to plaintiff's request to participate in a voluntary layoff. At the time of the layoff, plaintiff was *Page 6 
working with restrictions limiting the use of his right hand and lifting restrictions of 5 pounds, and was assigned to the task of assembling cleats in the defendant-plaintiff's furniture factory. Plaintiff received Unemployment Insurance benefits in the amount of $274.00 per week for twenty-six (26) weeks (October 26, 2003 through April 24, 2004).
11. On November 10, 2003, Dr. McGinnis examined plaintiff and observed no evidence of any muscle atrophy in the plaintiff's hands or forearms, the incision scar was tender to palpation, and plaintiff had good range of motion of his fingers and wrist. Plaintiff performed grip strength, key pinch, moving two-point discrimination and strength tests. Dr. McGinnis' plan as written stated that plaintiff had no restrictions in regard to use of the right hand, and a six week follow-up appointment was scheduled for repeat exam with grip strengths, pinch strengths, and moving two-point discrimination. Dr. McGinnis indicated that if plaintiff continued doing well, and his strength normalized, he would be released during the following visit. Plaintiff had informed Dr. McGinnis that he was laid off from work at the time of the examination.
12. On December 22, 2003, Dr. McGinnis examined plaintiff and observed no evidence of any muscle atrophy in the hands or forearms. Plaintiff performed grip strength, key pinch, moving two-point discrimination and strength tests. Plaintiff stated that he had not had any problem with the right hand at all over the past month. He had been performing his usual activities around the house with no apparent difficulty except when he experienced discomfort when he tried using a power saw. Dr. McGinnis opined that plaintiff had a slight amount of weakness on grip and pinch strengths, but that would most likely continue to improve over the next two to three months. Dr. McGinnis released plaintiff to perform all activities with no restrictions and released the plaintiff from care. Dr. McGinnis assessed plaintiff as having no *Page 7 
permanent impairment as a result of the right carpal tunnel release and encouraged follow up care on an as needed basis.
13. On September 2, 2004, Dr. Anthony J. DeFranzo, board certified plastic surgeon with a certificate and an added qualification of surgery of the hand, examined plaintiff and observed that plaintiff tested positive for Phalen and Tinel's signs on both the right and left hands; and negative for signs of pronator syndrome. Dr. DeFranzo opined that plaintiff still had carpal tunnel syndrome on the right and on the left. Dr. DeFranzo requested repeat grip and pinch measurements, gross sensibility, range of motion in the wrist and fingers, and nerve conduction tests; the doctor wanted to determine if plaintiff had recovered or had permanent damage to the right median nerve. Dr. DeFranzo did not specify work restrictions.
14. On December 16, 2004, The Hickory Orthopaedic Center performed nerve conduction studies on plaintiff. Dr. McGinnis compared the December 16, 2004 results to the pre-operative studies conducted on June 18, 2003. The right median nerve function showed evidence of improvement, however, the right median nerve function was not completely normal at the carpal tunnel. The left median nerve function at the carpal tunnel had deteriorated somewhat and there was evidence of left wrist mild median neuropathy, consistent with mild left carpal tunnel syndrome. Dr. McGinnis assessed that plaintiff had a 2% permanent partial disability rating to his right hand and that he may work without any restrictions.
15. On February 2, 2005, Ergo Science conducted the plaintiff's Physical Work Performance Evaluation (functional capacity evaluation "FCE"), which was limited in evaluation subject per Dr. Defranzo's recommendations. Plaintiff's Overall Level of Work was assessed at "medium" level; exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. *Page 8 
16. On February 10, 2005, plaintiff presented for assistance with employment opportunities with the North Carolina Vocational Rehabilitation Center. Based on the history given by plaintiff, he was considered by NCVR as qualified for light duty work restrictions. In order for the claimant to obtain employment as nearly as practicable to his pre-injury wage in light of his age, education, work experience and physical capacities, the claimant must obtain his GED and complete retraining through formal courses that meet his vocational aptitudes and interests at a local community college. The vocational expert determined that the plaintiff had not been active with the ESC since July, 2004 which would have occurred after expiration of the claimant's available unemployment benefits. Plaintiff testified that he continued reasonable work searches independently and attempted to obtain employment after his benefits were exhausted; however, he was unable to secure gainful employment.
17. On June 16, 2005, Dr. DeFranzo examined the plaintiff and reviewed most recent nerve conduction studies performed on the plaintiff for the purposes of assessing a permanent disability rating. Dr. DeFranzo stated the plaintiff had bilateral carpal tunnel syndrome due to a repetitive-type job in a furniture factory. Plaintiff's right carpal tunnel syndrome remained unresolved and he did not wish to receive treatment for his left carpal tunnel syndrome. Dr. DeFranzo assessed a 5% permanent partial impairment to the right hand in accordance with the American Medical Association Guidelines. Dr. DeFranzo reviewed the Functional Capacity Evaluation report and restricted the plaintiff to light duty job restrictions with a 20-pound weight limit and minimal repetitive use of his hands.
18. No medical evidence exists in the record to substantiate that plaintiff was unable to earn his pre-injury wages after November 10, 2003 as a result of a physical disability *Page 9 
sustained or work restrictions imposed upon plaintiff as a result of his compensable occupational disease.
19. Dr. McGinnis issued written medical reports stating that the claimant was able to return to work ten (10) days after surgery with light duty restrictions; and then plaintiff was released to perform his work without restrictions six weeks and four days after the plaintiff underwent surgery at a time when plaintiff had just been laid off from work at the end of the plant's low production period. Dr. McGinnis testified that he generally allows patients to return to work as tolerated however, in this case, his records indicate he released plaintiff to return to work without restrictions.
20. Dr. DeFranzo's medical notes and testimony reflect that the plaintiff was referred to him for a second opinion and disability rating.
21. The greater weight of the evidence shows that plaintiff has not experienced a continued worsening of his condition following his rating, and no further medical treatment has been recommended.
22. The Full Commission gives greater weight to the opinions of Dr. McGinnis, plaintiff's treating physician. Further, the Full Commission accepts his 2% permanent partial disability rating of his right hand as fair to plaintiff.
23. Dr. McGinnis released plaintiff to return to work without restriction on November 10, 2003, and testified during his deposition that plaintiff remains capable of returning to work without restriction.
24. The greater weight of the evidence shows that plaintiff was released to return to work as of November 10, 2003, and has not shown reasonable effort to look for work following his release, nor has plaintiff made a showing that a search for employment would be futile. *Page 10 
 * * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On April 29, 2003, plaintiff contracted an occupational disease, bilateral carpal tunnel syndrome, which was caused by his employment with the defendant/employer. N.C. Gen. Stat. § 97-53(13).
2. The cause of the employee's occupational disease is characteristic of and peculiar to the employee's employment. The employment created a greater risk of contracting/aggravating the employee's occupational disease than members of the general population who are not exposed to that type employment. N.C. Gen. Stat. § 97-53 (13).
3. Plaintiff is entitled to temporary total disability compensation beginning October 24, 2003, the date which plaintiff began a voluntary layoff while under work restrictions, through November 10, 2003, the date plaintiff was released to return to work without restrictions. The employer is entitled to an offset for Unemployment Insurance benefits received in the amount of $274.00 per week, from October 26, 2003 through November 10, 2003 as provided by N.C. Gen. Stat. § 97-42.1.
4. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable *Page 11 
effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993).
5. Plaintiff did not meet his burden to prove that following his release to return to work he was unable to obtain employment after a reasonable effort or that it was futile for him to seek employment because of other factors. Plaintiff was capable of work and no doctor took him out of work. N.C. Gen. Stat. § 97-29; Russell v. Lowes ProductDistribution, supra.
6. As a result of said occupational disease, the plaintiff sustained a 2% permanent partial disability to his right hand, and is therefore entitled to permanent partial disability benefits at the rate of $381.24 for 4 weeks. N.C. Gen. Stat. § 97-31.
7. Defendants shall pay all reasonable and necessary expenses for medicines, sick travel, medical, hospital and other treatment or course of rehabilitative services which are designed to effect a cure or provide relief. N.C. Gen. Stat. § 97-25.
8. Plaintiff has failed to show that as a result of his compensable occupational disease, he has experienced a continuing worsening of his left or right hands after receiving a permanent disability rating to his right hand and refusing treatment for his left hand, resulting in the need for additional medical treatment. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following: *Page 12 
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff at the rate of $318.24 per week, from October 23, 2003 through November 10, 2003. Defendants, however, are entitled to an offset in the amount of $274.00 per week for the amount of unemployment insurance benefits paid to plaintiff from October 23, 2003 through November 10, 2003. For his 2% permanent partial disability to his right hand, defendants shall pay to plaintiff permanent partial disability benefits at the rate of $318.24 for 4 weeks. Said amounts, minus the appropriate offset, shall be paid to plaintiff in a lump sum, subject to an attorney fee approved in Paragraph 3.
2. Defendants shall pay all reasonable and necessary expenses for medicines, sick travel, medical, hospital and other treatment or course of rehabilitative services which are designed to effect a cure or provide relief.
3. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: Twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs, including an expert witness fee to Dr. DeFranzo in the amount of $455.00.
___________________________ BUCK LATTIMORE CHAIRMAN
 CONCURRING: *Page 13 
___________________________ BERNADINE S. BALLANCE COMMISSIONER
___________________________ DIANNE C. SELLERS COMMISSIONER